1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAMES PEACOCK,                              No.  2:17-cv-01940 TLN KJN

12                    Petitioner,

13         v.                                     FINDINGS & RECOMMENDATIONS

14    JOEL MARTINEZ, Warden,

15                    Respondent.

16

17    I.  Introduction

18          Petitioner is a state prisoner, proceeding with counsel, with an application for a writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges his 2011 convictions for burglary,

20    petty theft, assault with a firearm, assault with a knife, and possession of a firearm by a felon.

21    Petitioner was sentenced to a total of thirty-one years, four months in state prison.  Petitioner

22    asserts a total of two claims in violation of his federal constitutional rights.  After careful review

23    of the record, this court concludes that the petition should be denied.

24    II.  Procedural History

25          On October 11, 2011, a jury found petitioner guilty of the following crimes and related

26    allegations: first degree burglary (Cal. Pen. Code[1] § 459(a)) and found true the personal use of a

27    _____

      [1] In the procedural history recitation, all further statutory references are to the California Penal
28    Code unless otherwise noted.

                                                    1

firearm (§ 12022.5(a)(1)) and personal infliction of great bodily injury (§ 12022.7(a)); petty theft (§ 484); assault with a firearm (§ 245(a)(2)) and found true the personal use of a firearm (§ 12022.5(a)(1)) and personal infliction of great bodily injury (§ 12022.7(a)); assault with a deadly weapon, to wit: a knife (§ 245(a)(1)) and further found true the personal infliction of great bodily injury (§ 12022.7(a)); and possession of a firearm by a felon (§ 12021(a)(1)). Additionally, the jury found petitioner not guilty of robbery and conspiracy to commit robbery. (1 CT 51-57; see also 2 CT 353-56.)[2] On December 9, 2011, petitioner was sentenced to a total of thirty-one years, four months in state prison. (1 CT 98-99.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District. (LD 1-3.) The Court of Appeal modified petitioner's sentence to correct a Section 654 sentencing error, but otherwise affirmed the convictions on April 18, 2016. (LD 4.)

Petitioner filed a petition for review in the California Supreme Court (LD 5), which was denied on June 29, 2016. (LD 6.)

Petitioner filed the instant petition on September 18, 2017. (ECF No. 1.) Respondent answered on December 19, 2017. (ECF No. 11.) Thereafter, respondent lodged the record with this court on January 4, 2018. (ECF No. 12.) Petitioner filed a traverse on February 15, 2018. (ECF No. 19.)

III. Facts[3]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

---

[2] "CT" refers to the Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal; "LD" refers to a document lodged with this court.

[3] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Peacock, No. C070068, April 18, 2016, a copy of which was lodged by respondent as Document 4.

**Prosecution Evidence**

At trial, the victim [Robert Hill] testified he managed a storage company and lived in an apartment above the business. Fox was the victim's methamphetamine supplier.[3] The victim also testified that prior to the day on which the charged crimes occurred, he sent Fox a text message in which he had offered to pay her money if she performed oral sex on him. Fox replied, "[O]kay," but never showed up and one to two weeks went by before the victim saw her next.

Around 8:00 p.m. on November 18, 2010, the victim received a text message from Fox. The text indicated she was getting off the freeway near his home, about five minutes away. He was a little surprised to hear from her. He had not invited Fox to visit that night and she had not asked to visit. When she arrived, he let her vehicle in through the facility gate and met her outside his garage door. He looked into her vehicle and did not see anyone else inside. Fox carried a backpack with her. Fox asked the victim if he would like to smoke methamphetamine with her and she also said she needed to charge her cell phone. The two walked up the stairway in the garage and entered the victim's apartment.

While Fox was seated in the victim's living room, she was looking at her cell phone and possibly pushing buttons. She asked the victim to clean his pipe, and he went into the kitchen and then the bedroom to do so. Fox told him she had to get something out of her car. As the victim was drying the pipe with a blow-dryer in his bedroom, he was surprised to see a man, later identified as defendant, masked by a red bandana, appear in the bedroom doorway, pointing a gun at the victim's head. Using the victim's first name, defendant ordered the victim to lay face down on his bed with his hands behind his back. Defendant threatened to "blow [the victim's] fucking head off" if he did not comply. As the victim laid down on the bed, defendant asked whom the victim had disrespected, then asked, "'Who is the girl that came here tonight?'" The victim replied that it was Fox, and defendant said, "'That's who you disrespected.'" Defendant repeatedly threatened to "blow [the victim's] fucking head off," and the victim felt the gun press against his head.

At some point, defendant climbed on the victim's back. From this position, defendant beat the victim on the back of the head with an object.

The victim could hear Fox walking around the bedroom, rummaging through drawers. He also heard her doing the same thing briefly in the living room. Fox went from one dresser to another in the bedroom. The victim asked Fox what was going on. She commented about the victim having offered her money to perform oral sex upon him. She was "pissed off" about that, but had not previously said anything to the victim about it. At the time she made that comment, she was going through the dresser drawers. Fox grabbed the victim by the hair, lifted his face up and sprayed him in the eyes with mace or pepper spray. She then started "beating down on" the victim's face

3

with her fist. At some point, the victim lost consciousness. The victim testified, "I think I got knocked out pretty quick...." When asked whether he had been "knocked out" before or after he was maced, the victim indicated he had been going in and out of consciousness and thought that after he was maced, he was "knocked out again or something."

When the victim regained consciousness, he charged defendant, who was blocking the bedroom doorway. The victim said there was a "massive struggle" to get out of the house. At the time of the struggle, the victim was "half unconscious." He did not recall seeing Fox at that time. The victim ran down the stairs, but the garage door had been barred by a rod, he described as a stiff piece of wire that was half the size of a pinky finger tip in diameter, bent in a U-shape. He had previously fashioned this rod to lock the garage door, but did not remember closing the garage door when Fox came in. He had to stop to remove the rod. As the victim lifted the garage door, he was struck on the head from behind with a hard object and his knees went weak, but he was able to escape. He ran to a gym located across the street and collapsed in its doorway. He then noticed for the first time that he was bleeding, with blood pouring out of his stomach. He thought he had been shot because he had seen a gun, but had not seen a knife and did not recall being stabbed. He did not remember being struck in the abdomen area. The gym staff called 911. While waiting for the ambulance, the victim slipped in and out of consciousness.

A stipulation was read to the jury that the victim "was transported to [the hospital] where he was treated for a stab wound to his abdomen. [He] suffered and was treated for injuries to his colon and a lung [due] to the stabbing. [He] also received sutures to his face and right hand due to lacerations. [He] did not receive treatment for any injuries to his eyes. [He] remained in the hospital for 6 days prior to release." There was no mention of blunt force injuries in the stipulation.

Upon returning home, the victim discovered his laptop, cell phone, and banking bag were missing.

The jury was shown recordings from surveillance video at the storage unit. The recordings showed: A dark SUV arrived at 8:10 p.m. and entered the gate at 8:12 p.m.; Fox entered through the garage at 8:13 p.m.; the garage door reopened and a male subject entered at 8:18 p.m.; the garage door reopened and the victim ran out at 8:23 p.m.; a few seconds later the male subject exited and ran towards the main gate but then turned and walked back, reentered the garage at 8:24 p.m., then exited again holding what appeared to be a handgun; Fox ran from the garage holding the backpack at 8:24 p.m.; and the SUV left at 8:25 p.m.

Cell phone records showed calls and texts from Fox's phone. About a minute before the male entered the victim's apartment, a text was sent from Fox's phone to defendant's phone which read, "Win i tex u ur gona hav to rush the door as soon as i open it." Both phones were "pinging" off the same cell tower about a half-mile from the crime scene.

At 8:49 p.m., about half an hour after the assault, a text was sent from Fox's phone to a different number stating, "Im going to prison babe im scard." Between 8:53 p.m. and 12:47 a.m., Fox texted a different number: "I need u to get me now plz i fuked up" and "[i]ts 911 for real." A responding text said, "Baby im all the way in l.a visiting my moms julia." Another text from Fox's phone said: "Omg i think i killed him." The response asked who and if everything was okay. Fox texted, "No no its not." Her correspondent advised, "Okay wipe the place dwn an get out mama." Fox replied, "Its to late for dat im out." Her correspondent then said, "Man its never to late to clean away evidence." Fox said, "Yea it is win muther fkr leakn every were runing down street scream n n he no my name." This prompted a query, "Jesus christ why you hit him in the head."[4] Fox replied, "I stabbed him several times." Her correspondent responded, "Dam thats wut he get for putn his hands on u lol karma." Fox reported it happened "at his business" and "[t]here were cameras," and "[i]t went realy bad im tryn to tell u." Her friend asked why it went bad. She replied, "Does it realy matter i gota go." In the days after the assault, a number of calls were made from defendant's phone to Fox's phone.

**Defense Evidence**

Fox testified. She denied sending the text message "'OMG, I think I killed him.'" She admitted she sent the text message, "'I stabbed him several times'" but claimed it was a typographical error, and she meant to text, "J stabbed him several times," referring to defendant James Peacock. Fox admitted sending text messages to friends about going to prison and "fuck[ing] up really bad" but claimed they were prompted by her fear that she would go to prison for not calling 911.

Fox testified that she had known the victim for about four years and had worked odd jobs at his storage facility. He had talked about making her assistant manager. Fox supported herself by selling methamphetamine and had previously sold the drug to the victim. Fox and defendant were "associates" who had known each other since childhood and at one time had a sexual relationship.

Fox testified that on the night in question, defendant gave her a ride to visit a friend in jail, but when they arrived she was unable to visit because all of the visiting appointments had been booked. While she was at the jail, she called the victim, who wanted her to bring him methamphetamine and talk about her employment situation. Defendant agreed to take her there but asked her to drive because he was not feeling well. At the victim's apartment, Fox got a weird vibe from the victim, who had previously asked her for sexual favors and to move in with him. The victim pulled out a pipe but she asked him to clean it because it was dirty. As he cleaned the pipe in the kitchen, he leered at her and made sexual comments about a "blow job." She testified that she went into the victim's stepson's bedroom to look for a cigarette lighter and texted defendant because she was concerned about the victim's behavior which had escalated to attempts to "grab on me and stuff." Fox said this was the text message in which she mentioned rushing the door, and she was referencing the garage door in the event she had to flee the apartment. She said she wanted

5

defendant there to protect her if the victim chased her outside.

Fox testified that the victim "started grabbing on my, my butt and trying to grab my crotch from behind." She spun and tried to push him away, but he got more aggressive. She tried to "mace" him with pepper spray but it bounced off his eyeglasses and just made him mad. He pushed her on the bed, grabbed at her breasts, and tried to undo her pants. She used her knee as leverage trying to push him back, and she hit him in the face with her left hand to knock the glasses off his face. He stumbled back. She maced him. He called her a "stupid fucking bitch." She ran down the stairs and opened the garage door. Defendant was standing there with a gun in his hand. She had not known he had a gun with him. Defendant ran up the stairs. Fox stood frozen. She heard the victim screaming. She ran upstairs and saw defendant holding the victim face down on the bed. Defendant asked her what had happened, and she said the victim tried to rape her. Defendant commanded the victim to utter the name of the woman he had disrespected. Fox said she did not call 911 because she was afraid defendant would do something to her, or she might get in trouble because she was there to sell drugs, and she did not want to lose her children.

Fox said she went into the downstairs office to look for the manual override switch to open the main gate. She found the switch but, before she could push it, she heard "really horrible, horrible screaming," and saw defendant come downstairs with his gun in one hand and a knife in his other hand. There was "blood all over." She knew defendant always carried a knife but had not seen it that evening. She denied ever handling that type of knife. As defendant came downstairs, he told her to go get the victim. She was dumbfounded. Defendant ran after the victim. Fox ran to the truck but then returned upstairs to retrieve her backpack. She removed a PlayStation from the backpack and left it there. She returned to their vehicle. She testified that the backpack did not contain any of the victim's property when she left. Defendant drove them away from the scene. Defendant asked Fox if the victim knew defendant's name; Fox said no.

Fox testified that defendant took her to his friend's home. When defendant left the truck to see if his friend was home, Fox used her phone to try to get help but no one believed her. At the friend's home, defendant said he needed Fox's phone and took it for a couple of minutes. Fox made up an excuse about a drug transaction and went home by herself.

Fox denied ever talking to defendant about assaulting or stealing anything from the victim.

Defendant presented an alibi defense. He testified he was never at the crime scene. He had a day job installing alarm systems and had a part-time business as a tattoo artist. At the time of the charged crimes, he was doing a tattoo at a "tattoo party" in the apartment of client Heather Shamblin.

Defendant testified Fox was an "old acquaintance" he rarely saw. He

6

once helped her find a place to stay when she was having problems with drugs and had her children taken away from her. On the afternoon of November 18th, she phoned him and said she knew someone who wanted a tattoo. She called back ten minutes later and asked defendant to give her a ride to the jail. Around 3:00 or 4:00 p.m., he picked her up in the vicinity of Fulton and Edison, drove her to the jail, let her borrow his cell phone, dropped her off at the jail, and drove to his home, forgetting Fox had his cell phone.

Defendant testified he was not driving his "Ford Chevy Blazer" that day, because it had been in an accident on November 4th. The SUV was drivable, but he rarely drove it. On the day in question, he was driving a Honda car borrowed from his cousin/roommate. When he got home after dropping off Fox at the jail, his SUV was missing. He did not file a police report, thinking someone may have taken it to a mechanic for him. Yet he acknowledged he was upset about his missing vehicle, as attested by his wife Brandi Marcum, who was his girlfriend at the time. He and Brandi drove the Honda to Shamblin's apartment. He did not pay attention to the clock. Defendant spent time discussing and drawing the design of the tattoo and checking the Honda for his cell phone, which was missing. He used Brandi's phone to call his own but heard no ringing. It was dark outside when he started tattooing. It took a long time, longer than it would have in his shop. During the tattooing, he took two or three breaks, went outside, smoked cigarettes, and relaxed his hands. After completing the tattoo, defendant and Brandi went to a friend's home, smoked marijuana, left about a half hour later and went home. Defendant could not sleep because his stomach was bothering him. Days later, defendant's SUV reappeared at his house. He said his phone and another phone, which he was unfamiliar with, were inside of the SUV.

Shamblin testified she did not know defendant or his girlfriend personally but hired him as a tattoo artist. He arrived in a Honda just before dark on November 18, 2010, between 5:30 p.m. and 7:00 p.m. They discussed and he drew the design for the tattoo, which took about an hour and a half. They took a cigarette break, and Shamblin prepared something for her son to eat. Defendant then did the tattoo, which took about three or four hours, stopping once for a five or ten minute cigarette break. Defendant was at Shamblin's home for about six hours total and left around midnight, give or take 20 minutes.

Brandi Marcum testified in sync with defendant's testimony. She said they left their home around 4:30 p.m. and arrived at Shamblin's apartment around 5:30 or 6:00 p.m. Defendant did not leave the apartment complex but did step outside a couple of times for cigarettes. A tattoo like that would probably take about two hours, but it was really hectic in the home, with people stopping by. Marcum and defendant left Shamblin's apartment around 11:00 or 11:30 p.m., went to a friend's house for about 20 minutes, and then went home. They went to bed, but defendant got up and left the bedroom. She fell asleep.

People v. Peacock, 2016 WL 1585641 at *1-5 (Apr. 18, 2016), fns. omitted.

7

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as

8

correct." Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [4] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state court was '"erroneous"'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

---

[4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 298 (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 101. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006).

V. <u>Petitioner's Claims</u>

A. *The Sufficiency of the Evidence*

Petitioner claims the evidence was insufficient to support his convictions for personally inflicting great bodily injury and for petty theft. (ECF No. 1-1 at 17-26; ECF No. 19 at 6-13.) Respondent contends the state court reasonably determined there was sufficient evidence to support both convictions. (ECF No. 11 at 15-20.)

The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> **I. Sufficiency of Evidence**
>
> Defendant argues the evidence was insufficient to prove he (1) personally inflicted great bodily injury (GBI) or (2) perpetrated or aided and abetted petty theft. We disagree.
>
> "'The standard of appellate review for determining sufficiency of the

11

evidence is settled. "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence....'"" (*People v. Howard* (2010) 51 Cal.4th 15, 33.) "Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. [Citation.] Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment." (*People v. Medina* (2009) 46 Cal.4th 913, 924, fn. 2.)

## A. Personal Infliction of GBI

Defendant argues the only injuries qualifying for the GBI enhancement (§ 12022.78) were the stab wounds, and there was no evidence he inflicted any of the stab wounds, all of which were inflicted by Fox. However, the stab wounds were not the only injuries. Defendant personally beat the victim on the head with a gun, and the victim lost consciousness, even before Fox stabbed the victim. The loss of consciousness supports the section 12022.7 finding against defendant.[9]

The trial court instructed the jury that great bodily injury means "significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." This instruction was correct. (§ 12022.7, subd. (f), fn. 8, *ante*; CALCRIM No. 3160; *People v. Cross* (2008) 45 Cal.4th 58, 63 (*Cross*).)

Whether harm amounts to GBI is a question of fact for the jury. (*Cross, supra*, 45 Cal.4th at p. 64 [pregnancy without medical complications that results from unlawful but nonforcible sexual conduct with a minor can support a GBI finding].) GBI is a substantial injury beyond that inherent in the offense, but "to be significant or substantial the injury need not be so grave as to cause the victim '"permanent," "prolonged," or "protracted"' bodily damage." (*Ibid.*)

GBI under section 12022.7 is ""'essentially equivalent'"" to "serious bodily injury" under the felony battery statute (§ 243, subds. (d), (f)(4)10), which specifies "loss of consciousness" as an example of serious bodily injury. (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1149–1150, citing *People v. Burroughs* (1984) 35 Cal.3d 824, 831, overruled on another ground in *People v. Blakely* (2000) 23 Cal.4th 82, 89.) In *Wade*, the defendant choked his girlfriend with so much pressure that she blacked out. (*Wade*, at p. 1146.) She did not know for how long she was unconscious. (*Ibid.*) Her daughter came to the victim's room, and they yelled at the defendant until he left. (*Id.* at pp. 1146–1147.) The victim had bruises on her neck for a week, but the choking did not impair her neck mobility, and she did not seek medical treatment. (*Id.* at p. 1147.) The *Wade* court upheld the felony battery conviction, rejecting the defendant's argument that medical treatment was essential to a finding of serious bodily injury. (*Id.* at pp. 1147–1150.)

Here, defendant acknowledges there was evidence that his beating of the victim's head with the gun caused the victim to lose consciousness. The severity of this injury is apparent in that the victim's unconsciousness was so deep that he was unaware he was being stabbed with a knife.

Defendant argues the loss of consciousness was not of sufficient duration to constitute GBI. He notes section 12022.7, as initially enacted (Stats. 1976, ch. 1139, § 306), listed examples of GBI, including "'"'[p]rolonged loss of consciousness.'"'" Defendant quotes from *People v. Nava* (1989) 207 Cal.App.3d 1490, that GBI "must be a significant and substantial injury as contrasted with injuries that could logically be described as constituting only transitory and short-lived bodily distress that do not fall within the contours of injuries that are severe and protracted." (*Id*. at p. 1496 [concluding that the trial court erred in instructing jury that bone fracture was GBI as matter of law], citing *People v. Johnson* (1980) 104 Cal.App.3d 598, 609.) Defendant argues the loss of consciousness in this case was "necessarily momentary" rather than prolonged, because the surveillance video showed defendant was at the crime scene less than five minutes, which included the time elapsed climbing the stairs, entering the bedroom, etc.

However, defendant's interpretation of the timeline does not show the loss of consciousness was necessarily momentary. In any event, there is no duration test as urged by defendant. Before section 12022.7 became operative, the Legislature (§ 12022.7, as amended by Stats. 1977, ch. 165, § 94, p. 679) deleted the specified examples of GBI and changed the definition of GBI from "'serious impairment of physical condition'" to "'significant or substantial physical injury.'" (*People v. Escobar* (1992) 3 Cal.4th 740, 747; *People v. Caudillo* (1978) 21 Cal.3d 562, 581.) In *Caudillo*, the court reasoned that the apparent legislative intent of the deletion was not to lessen the magnitude of bodily injury required, but rather to preclude the possibility that the listed examples would be viewed as all-inclusive. (*Id*. at p. 582.) The *Caudillo* court held a "transitory and short-lived" injury did not constitute GBI. (*Id*. at p. 588.) That wording was subsequently applied as a litmus test in some appellate cases such as those cited by defendant here. However, our high court in *Escobar* later held "*Caudillo* erred in concluding that the Legislature intended no change in the definition of 'great bodily injury' when it discarded the specific criteria set forth in the original version of section 12022.7 and substituted the more general 'significant or substantial physical injury' test then in use. Clearly, the latter standard contains no specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*Escobar*, at pp. 749–750.) The *Escobar* court concluded that GBI under section 12022.7 need not meet any particular standard for severity or duration, but need only be a substantial injury beyond that inherent in the offense itself. (*Escobar*, at pp. 746–747; see also *People v. Le* (2006) 137 Cal.App.4th 54, 58–60.)

Here, there was sufficient evidence from which the jury could conclude the victim's loss of consciousness from the beating inflicted by defendant was a significant and substantial injury constituting

GBI.

## B. Substantial Evidence of Petty Theft

Defendant argues there was no evidence he took any property and therefore his guilt must be predicated on aiding and abetting the theft by Fox, yet there is insufficient evidence he aided and abetted the theft. He emphasizes the jury was not instructed on a "natural and probable consequences" theory. We conclude the evidence was sufficient to support a finding that defendant aided and abetted the theft without regard to the theory of natural and probable consequences.

A person aids and abets commission of a crime when he promotes, encourages, or instigates the commission of the crime, by act or advice, with knowledge of the perpetrator's unlawful purpose, and with the intent or purpose of committing, facilitating, or encouraging the crime. (*People v. Hill* (1998) 17 Cal.4th 800, 851.) Advance knowledge of the principal's criminal purpose is not required. (*People v. Swanson–Birabent* (2003) 114 Cal.App.4th 733, 742.) Whether the defendant aided a crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences from the evidence are resolved in favor of the judgment. (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

Here, there was evidence that defendant held the victim at gunpoint in the bedroom, while the victim heard Fox moving around the apartment, opening and closing drawers. Indeed, the victim heard Fox going through drawers in the bedroom while his head was down and defendant was on top of him in the very same room. He also saw Fox go from one dresser to another in the bedroom. Given defendant's presence, he was clearly aware of Fox's activities in the bedroom while he was on top of the victim, holding him at gunpoint. Further, since the victim heard Fox going through drawers elsewhere in the apartment while defendant held him captive in the bedroom, it can be inferred that defendant heard Fox's activities also. And defendant later stood in the doorway to the bedroom while the victim was unconscious and attempted to block the victim's escape while Fox was apparently elsewhere in the apartment.

Defendant argues he did not take any property; he did not utter any words to Fox about taking property; and the victim's testimony established that defendant was concerned only with the victim having disrespected Fox by sexually affronting her. However, the evidence clearly shows that defendant facilitated the taking of property with the knowledge that Fox was looking for items to take. And it could further be inferred from the evidence that both the assault and the theft were payback for the sexual affront.

Substantial evidence supports defendant's theft conviction.

(People v. Peacock, slip op., LD 4 at *6-9 [fns. omitted].)

14

<u>Legal Standards & Analysis</u>

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). Thus, one who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. <u>Herrera v. Collins</u>, 506 U.S. 390, 401-02 (1993). Nevertheless, the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of <u>Jackson</u>. <u>Juan H.</u>, 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

<u>Id.</u> at 651 (citations omitted).

The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16. In performing a <u>Jackson</u> analysis, a jury's credibility determinations are "entitled to near-total deference." <u>Bruce</u>

v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). When the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution and must defer to that resolution. Jackson, 443 U.S. at 326.

Under Jackson, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. Schlup v. Delo, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under Jackson, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1 (2011) (per curiam). Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Id. at 2. Under Cavazos, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. at 2 (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

### A Preliminary Matter

Initially, the undersigned notes that to the degree petitioner argues the state court's factual determinations were erroneous, he has not overcome the presumption of their correctness by clear and convincing evidence. Sumner v. Mata, 449 U.S. 539, 546 (1981) (state appellate court findings are entitled to correctness presumption). A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); Stanley, 633 F.3d at 859. As referenced specifically below, the record establishes the state court's factual determinations were reasonable in light of the evidence presented in the state court proceeding.

### Great Bodily Injury

First, the undersigned notes that respondent is correct in his assertion that where the state court's interpretation of an element of the enhancement forms the basis for petitioner's challenge, this court cannot second guess the state court's litigation of this issue – it is an issue of state law.

16

1   Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

2       In any event, a review of this record confirms the state court's determination was

3   reasonable. A rational trier of fact could have found the essential elements of the crime of

4   personal infliction of great bodily injury beyond a reasonable doubt. Jackson, 443 U.S. at 319.

5   The jury's conclusions are supported by substantial evidence and are entitled to this court's

6   deference. Bruce v. Terhune, 376 F.3d at 957. There was evidence, accepted as credible by the

7   jury, sufficient to sustain petitioner's convictions. Schlup v. Delo, 513 U.S. at 330.

8       California Penal Code section 12022.7(a) provides that "[a]ny person who personally

9   inflicts great bodily injury on any person other than an accomplice in the commission of a felony

10  or attempted felony shall be punished by an additional and consecutive term of imprisonment in

11  the state prison for three years." Great bodily injury is defined for purposes of the statute, in

12  subdivision (f), as "a significant or substantial physical injury." This "standard contains no

13  specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement,

14  impairment, or loss of bodily function." People v. Escobar, 3 Cal.4th 740, 750 (1992).

15  However, the victim's injury must exceed the injury inherent in the substantive offense. Id. at

16  746-47. But "to be significant or substantial the injury need not be so grave as to cause the victim

17  'permanent, prolonged, or protracted' bodily damage." People v. Cross, 45 Cal.4th 58, 64 (2008)

18  (quoting Escobar, 3 Cal.4th at 750). Nor are "medical complications or the use of force . . .

19  required to support a finding of great bodily injury." Id. Instead, such a finding "rests on the

20  facts as presented at trial in the context of the particular crime and the particular injuries suffered

21  by the victim." Id. (citing Escobar, 3 Cal.4th at 750). In particular, great bodily injury "is

22  commonly established by evidence of the severity of the victim's physical injury, the resulting

23  pain, or the medical care required to treat or repair the injury." Cross, 45 Cal.4th at 66. "A fine

24  line can divide an injury from being significant or substantial from an injury that does not quite

25  meet the description. Where to draw that line is for the jury to decide." Id. at 64 (internal

26  quotation marks omitted). Abrasions, lacerations, and bruising may constitute great bodily injury.

27  People v. Washington, 210 Cal.App.4th 1042, 1047 (2012).

28  ////

Here, there was evidence the victim sustained blows to the back of the head.[5]  (See 1 RT 114, 118, 174, 182, 205-07 [Hill testimony]; 2 RT 534 & 3 RT 606-08, 616, 640, 667 [Fox testimony]; see also 2 RT 334-35 [Resch testimony]; 402, 406-11 [Figueroa testimony].)  That testimony establishes the victim suffered blows to the back of the head from a gun wielded by petitioner while the victim was restrained and possibly from another object while the victim was fleeing from his attacker.  Being struck repeatedly on the back of the head with a firearm can amount to a significant or substantial injury exceeding that inherent in the substantive offense.  Escobar, 3 Cal.4th at 746-47, 750; Cross, 45 Cal.4th at 64.  The fact the "medical evidence" or the stipulation entered into by the parties at trial concerning the victim's more major injuries[6] fails to specifically indicate the victim received treatment for an injury to the back of his head does not make the state court's determination objectively unreasonable.  Cross, at 66; Washington, 210 Cal.App.4th at 1047.  The jury could, and did, reasonably determine that great bodily injury was inflicted upon the victim in this case given the factual context as presented at trial.

Petitioner takes issue with the state court's specific finding that he "'acknowledge[d] there was evidence that his beating of the victim's head with the gun caused the victim to lose consciousness.  The severity of this injury is apparent in that the victim's unconsciousness was so deep that he was unaware he was being stabbed with a knife.'"  (ECF No. 1-1 at 20-21.) Petitioner contends he consistently argued "great bodily injury was caused by Fox," meaning he acknowledged no such evidence.  (ECF No. 1-1 at 21.)

A review of the Appellant's Opening Brief filed with the Third District Court of Appeal provides context for that court's finding.  At page 23 of the brief, petitioner wrote: "Here, Hill testified Peacock was 'beating his head in with the gun' (1 RT 114) and, prior to escaping through the garage door, he was hit on the head with a 'very hard object.'"  (1 RT 118.)  And at page 24, petitioner wrote that "Hill testified that he believed he lost consciousness part of the time."  (1 RT

---

[5] The victim testified that Fox hit him in "front of [his] face."  (1 RT 119.)

[6] That the victim suffered stab wounds to the abdomen injuring the colon and lung, as well as lacerations to the face and hand requiring sutures, and required six days of hospitalization.  (2 CT 340.)

116.)  Those passages – acknowledging there existed evidence that the victim was struck on the head and lost consciousness - can account for the state court's language.  It is plain that petitioner was arguing the evidence was insufficient and that the state court disagreed.  In any case, *the jury's decision is not to be overturned unless it is determined to be objectively unreasonable.* Cavazos, 565 U.S. at 1.

Regarding the loss of consciousness,[7] the record includes the following evidence by way of the victim's trial testimony:  (1) "It's kind of hard for me to exactly recall because I think I went unconscious for awhile," the victim agreed he "kind of ha[s] a lapse in memory;" and that when he "came back to" the victim was "still l[]ying on the bed" and petitioner "was blocking the doorway" (1 RT 116); (2) on cross-examination by petitioner's counsel, the victim stated "I think I got knocked out pretty quick, so I didn't see much" (1 RT 202), and "got knocked out again or something" (1 RT 204) and was "coming in and out" of consciousness (1 RT 204); and (3) on redirect examination, the victim testified that he did not recall actually being stabbed.  (1 RT 245.)

Petitioner argues, contrary to the state court's finding there was evidence the victim lost consciousness before Fox stabbed the victim, "that the record does not establish Hill lost consciousness as a result of being hit with the firearm.  Hill did not claim to lose consciousness until after Fox began 'punching' him."  (1RT 113-16.) (ECF No. 1-1 at 21.)  But the record as a whole reveals the victim was somewhat uncertain regarding the timing of his loss of consciousness and also includes the testimony of Elk Grove Police Officer Terry Cooley who indicated that the victim advised him at the hospital on the night of the incident that he was simultaneously fighting with the man wearing the bandanna and codefendant Fox.  (2 RT 323-24.)  Hence, there is certainly nothing objectively unreasonable about the state court's finding that there was evidence the victim was unconscious before being stabbed by Fox.  Cavazos v. Smith, 565 U.S. at 2.

////

---

[7] An officer responding to the gym to which the victim escaped after the attack, testified the victim was fading in and out of consciousness.  (1 RT 259-60.)

It was the jury's job to decide what conclusions it could draw from the evidence presented during trial. Cavazos, 565 U.S. at 2. This jury concluded from the evidence presented at trial that petitioner struck the victim in the back of the head with a gun causing great bodily injury. And it could have reasonably inferred a loss of consciousness based upon the evidence presented at trial. Such a finding does not amount to one wherein no rational trier of fact could have so held; therefore it was not objectively unreasonable. Id. at 1-2.

In conclusion, viewing all of the evidence in the light most favorable to the prosecution, the undersigned concludes that a rational trier of fact could have found beyond a reasonable doubt that the victim was beaten in the back of the head resulting in a loss of consciousness sufficient to establish that great bodily injury was inflicted. Jackson, 443 U.S. at 319. The state court's determination in this regard was not "so lacking in justification there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103. The undersigned recommends this claim be denied.

### Petty Theft

As for petitioner's claim there was insufficient evidence of petty theft, and thus the state court's finding is unreasonable, the undersigned disagrees.

"'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citation.]" People v. Hill, 17 Cal.4th 800, 851 (1998). An aider and abettor has the requisite intent "when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." People v. Beeman, 35 Cal.3d 547, 560 (1984).

Here, the victim testified when his friend Julia Fox arrived on the evening of the incident, she was alone. (1 RT 99-100.) A short time later, after Fox asked the victim to clean a pipe the two would use to smoke methamphetamine and told him she had to retrieve something from the car (1 RT 106-08), a man appeared in the victim's bedroom doorway, wearing a red bandanna

and pointing a gun. (1 RT 109.) That man called the victim by name and told him to lie face down on the bed. The victim did not see codefendant Fox at that time. (1 RT 109-10.) The man with the gun threatened to blow the victim's head off and kept him at gunpoint. (1 RT 110, 113, 241.) As the victim was held at gunpoint in his bedroom, he could hear someone "walking around, moving things." (1 RT 113.) The victim heard "drawers being opened and closed" in his bedroom and also "heard some noise out in the living room." (1 RT 119; see also 1 RT 241 [Fox going through dresser].) Fox came in and out of the victim's bedroom several times during the incident whereas the armed man stayed put. (1 RT 241.) After the incident, the victim returned home to find his laptop, cellphone and a bank bag missing. (1 RT 120.)

It was not objectively unreasonable for the state court to find the evidence proffered at trial was sufficient to support petitioner's conviction for petty theft on an aiding and abetting theory. The record established there was evidence in the form of text messages between Fox and petitioner, and particularly a text message from Fox to petitioner while she was in the victim's home advising petitioner that when she opened the door, he would need to "rush" it. (2 RT 302-03.) Moreover, the armed man was wearing a bandanna from which it can be reasonably inferred that a robbery or theft was planned, and the actor did not wish to be identified. It is also reasonable to infer from this evidence that petitioner was aware of Fox's plan to steal from the victim and intended to facilitate that plan. Further, by keeping the victim restrained and at gunpoint, and confined within his own bedroom by blocking the bedroom doorway with his person while armed with a gun, petitioner's acts aided and promoted the commission of the theft. Hill, 17 Cal.4th at 851; Beeman, 35 Cal.3d at 560.

Petitioner's argument in this court amounts to nothing more than his interpretation of the evidence to his advantage, essentially ignoring the reasonable inferences that can be made from that evidence. (ECF No. 1 at 25-26.) But this court's task is to presume the trier of fact resolved the conflicts in favor of the prosecution; in fact, it defers to the jury's findings in favor of the prosecution. Jackson, 443 U.S. at 326. From the evidence quoted above, the jury drew its conclusions against petitioner, and the state court's decision to affirm petitioner's conviction for petty theft is not objectively unreasonable in light of the evidence. Cavazos, 565 U.S. at 2.

The California Court of Appeal determined that there was sufficient evidence of each element of the crime at issue to support petitioner's conviction. Although it might have been possible to draw a different inference from the evidence, this court is required to resolve that conflict in favor of the prosecution. Petitioner bears the burden of establishing by clear and convincing evidence that the factual findings were erroneous; a burden petitioner has failed to carry. The record does not compel the conclusion that no rational trier of fact could have found proof of guilt, particularly considering the double deference owed under Jackson and AEDPA.

In sum, petitioner has not established that the state court's determination was unreasonable or contrary to Supreme Court precedent, nor were the state court's factual determinations objectively unreasonable in light of the evidence presented at trial. 28 U.S.C. § 2254. Petitioner is thus not entitled to relief on his claim and the undersigned hereby recommends the claim be denied.

B.     *Sentence Disparity*

Petitioner claims the disparity in sentences imposed against he and his co-defendant Fox is fundamentally unfair and a violation of his constitutional rights to jury trial, due process and equal protection. (ECF No. 1-1 at 26-32; ECF No. 19 at 13-16.) Respondent maintains that the state court's determination that the sentence imposed was not unconstitutionally disparate was reasonable. (ECF No. 11 at 20-24.)

The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Defendant claims a "disparate" sentence was imposed against him (31 years 4 months) in comparison to codefendant Fox's sentence (five years), in violation of his federal and state constitutional rights to a jury trial, due process, and equal protection. (U.S. Const., 5th, 6th, 14th Amendments; Cal. Const., art. , §§ 7, 16, 24.) Notably, defendant does not claim cruel and unusual punishment, though he cites cases on that subject. He does not provide any analysis or authority on due process and equal protection. Defendant's constitutional claim fails.
>
> Assuming for the sake of argument that intracase proportionality

22

review is appropriate, such review examines whether a defendant's sentence is ""'"proportionate to his individual culpability, irrespective of the punishment imposed on others."'"'" (*People v. Jackson* (1996) 13 Cal.4th 1164, 1246.) "The disparity in sentencing imposed on [the] defendant and [a codefendant] does not establish that defendant's sentence is grossly disproportionate to the offense he committed. Evidence of the disposition of a codefendant's case, as opposed to evidence of the codefendant's complicity and involvement in the offense, is not relevant to the decision at the penalty phase [death sentence], which is based on the character and record of the individual defendant and the circumstances of the offense." (*People v. Mincey* (1992) 2 Cal.4th 408, 476.) "A sentencing court considers not only the circumstances of the crime, but circumstances individual to each defendant.... So long as [the defendant's] sentence was justified by [the defendant's] crimes, individual culpability, and record, the sentence received by an accomplice is not relevant." (*People v. Foster* (1988) 201 Cal.App.3d 20, 27, citation omitted.)

Here, both defendant and Fox were complicit and deeply involved in the assault on the victim. While Fox may have set up the crime, defendant provided the muscle and the firearm. In sentencing Fox, the trial court contrasted defendant's culpability. The court said, it sentenced defendant to "31 years largely because of his criminal history and his violent nature." Defendant presented a very different situation than Fox. He had the additional present conviction (felon in possession of a gun) and prior conviction for attempted voluntary manslaughter of a park ranger, which also involved his use of a firearm. The prior conviction not only doubled defendant's base terms, but also accounted for a consecutive five-year serious felony enhancement. Additionally, defendant's personal use of a firearm added ten years and reflects legislative intent to punish more harshly criminals who personally use guns. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 18 [discussing § 12022.53].) Contrary to defendant's assertion that there was no evidence the victim suffered head wounds from being hit with the gun, the victim suffered loss of consciousness from defendant hitting the victim on the head with the gun. Accordingly, the prison sentence imposed by the trial court here can be connected to his individual conduct and prior record.

Defendant claims that, even factoring in his prior conviction, fairness demands he receive no more than the low term for burglary, doubled, plus the low or middle term for the firearm enhancement. However, defendant fails to show a constitutional violation in sentencing. We reject his reliance on *People v. Dillon* (1983) 34 Cal.3d 441, which found cruel and unusual punishment where a 17 year old with no criminal record received a life sentence for murder while none of his cohorts were sentenced to state prison. (*Id.* at p. 488.) Here,

defendant was a 35–year–old adult who committed a violent home invasion and assault and had a prior conviction for attempted voluntary manslaughter of a peace officer, also involving a firearm, in addition to a firearm offense as a juvenile.

Defendant cites *United States v. Bischel* (9th Cir.1995) 61 F.3d 1429, which said imposition of disparate sentences in itself is not generally an abuse of discretion, but an explanation is required when there is substantial disparity and evidence that the judge is punishing one defendant for exercising his right to stand trial. (*Id.* at p. 1437.) The court in *Bischel* cited *United States v. Capriola* (9th Cir.1976) 537 F.2d 319, in which the defendants who chose to stand trial received a harsher penalty than co-conspirators who pleaded guilty. The *Capriola* court remanded to permit the trial court to state a reason or ameliorate the sentences. (*Capriola*, at pp. 320–321.) We note that the court in *United States v. Hall* (9th Cir.1985) 778 F.2d 1427, 1428, said *Capriola* is limited to its facts. And the *Bischel* court saw no reason to remand where the record showed reasons for the harsher sentence, including prior conviction, criminal history, leadership role in the criminal conduct, and absence of evidence that the disparity was due to the defendant exercising his trial rights. (*Bischel*, at p. 1437.)

Here, both defendants went to trial, and therefore the disparity in sentences cannot be attributed to defendant having exercised his right to a jury trial.

We conclude defendant fails to show grounds for reversal.

(People v. Peacock, slip op., LD 4 at *14-15 [fns. omitted].)

The Sentencing Proceedings

Following oral argument by defense counsel and the prosecutor, the relevant sentencing proceedings are excerpted below:

[THE COURT:]  The Court, as I have noted, has read and considered the probation report and the sentencing memoranda[] submitted on behalf of the People and Mr. Peacock.

And I was reviewing the probation report again to familiar[ize] myself and remind myself of what happened back in 1996, Mr. Peacock, when you were convicted of attempted voluntary manslaughter.

The probation report notes that while you were being chased, or park rangers were trying to apprehend you and an accomplice for quote,

24

"smoking marijuana", that following the chase while you were laying or hiding in a nearby creek bed, that you discharged an 11 millimeter pistol at a peace officer three times. Hit him in the chest.

Fortunately, the officer was wearing a bullet proof vest. The Officer obviously did suffer some trauma to his chest. [¶] I understand he returned fire, and I know you were injured, and you made references to that during the course of the trial.

But, nonetheless, the reason I refer to that is your history involves weapons, an assault on a peace officer with a weapon. And had this peace officer, the park ranger not been wearing a bullet proof vest, you might have been convicted for quite a different offense. Not attempted voluntary manslaughter and possibly as serious as murder, but you were not. So you have a demonstrated a propensity for violence. [¶] The facts surrounding the offenses before the Court demonstrate that as well.

The Court is going to find that you are not eligible for probation. [¶] The Court will not grant you probation even if you were eligible. [¶] You are ineligible. And you will be sentenced to state prison accordingly.

The Court will select the, as the base term, the burglary, the conviction in Count 1 for Penal Code Section 459, and the Court is going to sentence you to the upper term, that is, six years.

And the Court selects the upper term because of the nature of the offense, the seriousness of the facts surrounding the offense, the cruelty, the violence involved. And as I have noted, your propensity to be violent and have used violence in the past against a peace officer in particular. [¶] You are a danger to society. [¶] You have demonstrated that before by firing a weapon at a peace officer. And by engaging in the conduct that you engaged in now, you are lucky you are not here again on attempted murder and/or if this man would have died, on a murder charge.

So those are the reasons the Court selects the upper term, six years.

Following your admission of the prior strike conviction, Mr. Peacock, by law your six … year term is doubled, as I am sure your lawyer told you. So the base term will be six years doubled for a term of 12 years.

Following the jury's finding that a firearm was indeed used pursuant to Penal Code Section 12022.5, the Court again selects the upper term, recognizing that it has the discretion to impose a low term of three or middle term of four.

The Court selects the upper term of ten again, because of the violent conduct involved, the callousness, the viciousness of the offense.

The Court records and transcript will reflect that the victim did testify that he was struck to the head several times by what later turned out to be a solid hard object, i.e. the firearm.

In light of the Court's - - jury's finding that you imposed or inflicted, I should say, great bodily injury on the victim, no doubt, pursuant to the stabbing, and that is the finding pursuant to 12022.7, the Court further enhances the base term by three years.

So the total sentence for the base term is the 12 years for the burglary, that is, the six years doubled, the ten year enhancement for use of the firearm, and the three year enhancement for the great bodily injury, for a base term that is, a principal term of 25 years in State Prison.

You were a felon at the time of the offense. [¶] You were [prohibited] by law from possessing a firearm. That is a separate divisible criminal act that the Court will impose an additional consecutive term.

And the Court imposes the consecutive term again, because the Court finds that the - - being in possession of a firearm is independent and separate and apart from the violent acts that occurred during the burglary and the assault on the victim.

You have a prior history of violence. [¶] You have been incarcerated in State Prison previously. You have been on parole. And, moreover, the victim was assaulted in his own residence.

For those reasons, the Court imposes a consecutive sentence of the mid term of two years. [¶] However, by law, only one-third of the two years, eight months, is imposed. [¶] And following your admission of the prior strike conviction, that eight months is doubled for a consecutive term of sixteen months, so that makes a total principal term of 26 years and four months.

Finding your admission, I should say after your admission of the truth of the prior strike, the attempted voluntary manslaughter, and the allegation contained in the Information that such conviction falls within the meaning of Penal Code Section 667(a), the Legislature mandates that you be sentenced to an additional five years in prison consecutively because of that prior strike conviction.

[¶]-[¶]

So the Court enhances your sentence pursuant to Penal Code Section 667(a) for an additional five years, for a total aggregate prison term of 31 years and four months.

(5 RT 1242-46.)

Legal Standards and Analysis

Initially, again, to the degree petitioner argues the state appellate court's facts are in error, he has failed to establish any such error by clear and convincing evidence.

"'[I]t is not the province of a federal habeas court to reexamine state court determinations

26

on state law questions.'" Wilson v. Corcoran, 562 U.S. at 5 (quoting Estelle, 502 U.S. at 67). So long as a sentence imposed by a state court "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976). "Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994). Thus, whether or not the sentencing judge in this case abused his discretion under state law when he imposed petitioner's sentence is not at issue in this federal habeas corpus proceeding.

On federal habeas review, the question "is not whether the state sentencer committed state-law error," but whether the sentence imposed on the petitioner is "so arbitrary or capricious" as to constitute an independent due process violation. Richmond v. Lewis, 506 U.S. 40, 50 (1992); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000). "The failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state." Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993). However, "federal courts are extraordinarily chary of entertaining habeas corpus violations premised upon asserted deviations from state procedural rules." Hernandez v. Ylst, 930 F.2d 714, 719 (9th Cir. 1991).

Here, as evidenced by the sentencing proceedings excerpted above, there was nothing arbitrary or capricious about the sentence imposed on petitioner so as to constitute an independent due process violation. The trial judge clearly identified the bases for his sentencing decision and specifically identified petitioner's criminal history and its violent nature. Richmond, 506 U.S. at 50. And there is no evidence of a failure to abide by statutory commands nor evidence of a deviation from procedural rules. Fetterly, 997 F.2d at 1300; Hernandez, 930 F.2d at 719.

Next, the Eighth Amendment does not require strict proportionality between crime and sentence, but rather forbids only extreme sentences that are grossly disproportionate to the crime. Harmelin v. Michigan, 501 U.S. 957, 959 (1991) (Kennedy, J., concurring in part and concurring

27

in judgment). The precise contours of the gross disproportionality principle are "unclear and applicable only in the 'exceedingly rare' and 'extreme' case." Lockyer, 538 U.S. at 73.

This undersigned notes that petitioner's sentence does not fall within the type of "exceedingly rare" circumstance that would support a finding that his sentence violates the federal constitution. Petitioner was convicted of burglary, petty theft, assault with a firearm, assault with a knife, and possession of a firearm by a felon. Petitioner had been previously convicted of a serious felony and had served a prior prison term. Pursuant to United States Supreme Court precedent, petitioner's sentence is not grossly disproportionate to these crimes. See Harmelin, 501 U.S. at 1004-05 (life imprisonment without possibility of parole for possession of 24 ounces of cocaine raises no inference of gross disproportionality); Lockyer, 538 U.S. at 73-77 (two consecutive twenty-five years to life sentences with the possibility of parole for two petty theft convictions with priors did not amount to cruel and unusual punishment); Ewing v. California, 538 U.S. 11, 28-31 (2003) (a sentence of twenty-five years to life for felony grand theft under California's Three Strikes law did not violate the Eighth Amendment).

The undersigned also observes that petitioner has not cited any case, and the undersigned has not found one, in which the United States Supreme Court has found that a sentence imposed on a state criminal defendant violated the federal constitution because it was disproportionate or disparate to the sentences imposed on other defendants in the same case. Accordingly, the state court did not unreasonably apply federal law in concluding that petitioner was not entitled to relief with respect to this challenge to his sentence. See Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) ("we conclude that when a Supreme Court decision does not 'squarely address[ ] the issue in th[e] case...it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision"); see also Earp v. Ornoski, 431 F.3d 1158, 1185 (9th Cir. 2005).

In any event, there is no federal constitutional requirement that co-defendants receive the same sentence. The critical factor for a court in determining whether a sentence is so disproportionate as to constitute cruel and unusual punishment appears to be whether the sentence is grossly disproportionate to the crimes, not whether the sentence is grossly disproportionate to

the sentences received by co-defendants.  See United States v. Easter, 981 F.2d 1549, 1555-56 (10th Cir. 1992).  "[A] defendant cannot rely upon his co-defendant's sentence as a yardstick for his own; a sentence is not disproportionate just because it exceeds a co-defendant's sentence." United States v. Granados, 962 F.2d 767, 774 (8th Cir. 1992).  A defendant who claims that he received a disproportionate sentence "[m]ust establish more than the mere fact that other defendants have received less harsh sentences for similar crimes."  See United States v. Fry, 831 F.2d 664, 667 (6th Cir. 1987).

Finally, petitioner claims, without elaboration, that his sentence violates the equal protection clause.  The equal protection clause directs state actors to treat similarly situated people alike.  See Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect class.  McCleskey v. Kemp, 481 U.S. 279, 292 (1987); Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 457-58 (1988).  A criminal defendant alleging an equal protection violation must specifically prove that the "decisionmakers in his case acted with discriminatory purpose." McCleskey, 481 U.S. at 292 (quoting Wayte v. United States, 470 U.S. 598, 608 (1985)). Petitioner's equal protection claim is deficient on its face because it does not allege purposeful discriminatory treatment based on his membership in a suspect class.  In addition, petitioner has not demonstrated that the sentencing judge in this case "acted with discriminatory purpose" or selected or affirmed his sentence because of "its adverse effects upon an identifiable group." McCleskey, 481 U.S. at 292, 298.  Notably too, the Equal Protection Clause "permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences."  Williams v. Illinois, 399 U.S. 235, 243 (1970).

Lastly, as petitioner did in the state courts, he again relies upon United States v. Bischel, 61 F.3d 1429 (9th Cir. 1995), and United States v. Capriola, 537 F.2d 319 (9th Cir. 1976), to support his argument.  Petitioner cites to the second to last paragraph of the state appellate court's opinion and complains that court incorrectly "dismisse[d] this factor," referring to the requirement a court give an explanation for "disparity to avoid the suggestion that the more severe sentence was a result of the defendant's exercising his right to trial."  (ECF No. 1 at 29.)

The undersigned's review of the record reveals there is nothing objectively unreasonable about the state court decision. The trial judge provided an explanation for the greater sentence imposed against petitioner, versus that imposed upon codefendant Fox. (Cf. 5 RT 1242-47 to 5 RT 1259-64.) Further, there is simply no indication in this record that the trial judge was punishing petitioner for exercising his right to stand trial.

In sum, the state court's rejection of petitioner's disparate sentence claim was not contrary to, nor an unreasonable application of, clearly established federal law as set forth by the Supreme Court. Nor did it involve an unreasonable determination of the facts in light of the evidence presented at trial. 28 U.S.C. § 2254. The undersigned recommends this claim be denied.

VI. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 22, 2020

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Peac1940.157

30